## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ATHENS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:22-cr-14 (MTT) |
| | ) | |
| LESLEY CHAPPELL GREEN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER

Defendant Lesley Green moves to suppress custodial statements (Docs. 170; 173), evidence obtained through a wiretap (Doc. 171), and evidence obtained during the execution of a search warrant on his home (Doc. 172).  For the following reasons, Green's motion to suppress certain custodial statements (Docs. 170; 173) is **GRANTED in part and DENIED in part**.  His motion to suppress wiretap evidence (Doc. 171) and motion to suppress evidence obtained during the execution of the search warrant (Doc. 172) are **DENIED**.

## I. BACKGROUND[1]

Based on their alleged participation in criminal activities as members of the Gangster Disciples organization, Green and codefendants Philmon Chambers, Andrea Browner, Robert Carlisle, and Shabazz Guidry were indicted on a charge of Racketeer Influenced and Corrupt Organizations Act ("RICO") Conspiracy in violation of 18 U.S.C. § 1962(d) on June 15, 2022.  Docs. 1 at 7-20; 220 at 8-20.  Pertinent here, the indictment alleges defendant Chambers was involved in the murder of Rodriguez

---

[1] These facts are drawn from the indictment, the parties' briefs and exhibits, and the June 14, 2023 evidentiary hearing.

Rucker and both Green and defendant Chambers were involved in the murders of Derrick Ruff and Joshua Jackson.  Doc. 220 at 15-17.  The evidence against Green is based, in part, on statements made by him to law enforcement officers, evidence found in his home, and evidence obtained through a wiretap order on cell phones used by defendant Chambers.  Docs. 170; 171; 172; 173.

Trial is set for July 31, 2023.  Doc. 153.  On April 19, 2023, Green filed three motions to suppress.  Docs. 170; 171; 172; 173.  The Court held an evidentiary hearing on June 13, 2023.  Doc. 224.

**A. Custodial Statements**

*i. February 8, 2019 Interview at the Cobb County Jail*

On February 8, 2019, Athens-Clarke County Police Department Lieutenant Derek Scott and FBI Task Force Officer ("TFO") Dana Frost interviewed Green at the Cobb County Jail after they discovered evidence indicating that Green was in communication with Ruff, who, at the time, was missing and was later found dead.  Doc. 184 at 5. Green was being held on an Emerson Police Department arrest warrant unrelated to this case.  Docs. 170 at 2; 170-1 at 2.  The officers believed Green had information about Ruff's, as well as Jackson's, disappearances, and they considered Green a person of interest in the investigation.  Doc. 224.

For the interview, Green was moved to a holding cell.  *Id*.  Lieutenant Scott and TFO Frost were escorted by a Cobb County deputy into the holding cell and that deputy remained inside the holding cell during the entire interview.  *Id*.  It is unknown whether Green was in handcuffs or leg irons during the interview.  *Id*.  The holding cell was locked during the entire interview.  *Id*.  Green, Lieutenant Scott, and TFO Frost sat on benches during the interview.  *Id*.  The Cobb County deputy stood, although it is

unknown whether he blocked Green's access to the door. *Id*. No officer was armed with firearms; however, the Cobb County deputy had some type of weapon, likely a taser. *Id*.

Neither Lieutenant Scott nor TFO Frost informed Green of his *Miranda* rights before or during the interview. Docs. 170 at 2; 184 at 4-5. Neither officer informed Green he was free to leave the interview. Doc. 224. The interview lasted between five and ten minutes. *Id*. Lieutenant Scott and TFO Frost first introduced themselves and then asked questions regarding whether Green knew Ruff, Jackson, or defendant Chambers. Doc. 170-1 at 2-3. Specifically, the officers showed Green separate pictures of all three men and Green denied knowing any of them. *Id*. at 3. At one point, TFO Frost showed the Cobb County deputy a group picture that both Green and defendant Chambers were in and asked the Deputy whether one of the men in the picture looked like Green. *Id*.

*ii. March 18, 2019 Interview at the Gwinnett County Detention Center*

"On March 18, 2019, Gwinnett County Law Enforcement officers arrested [defendant] Green on charges related to this case and immediately transported him to the Gwinnett County Police Department Headquarters." Doc. 170 at 3. Gwinnett County Police detective Poppe and FBI Special Agent Hipkiss went to the Gwinnett County Police Department headquarters to interview Green that same day. Docs. 170 at 3; 184 at 7. Prior to the start of the interview, it is undisputed that detective Poppe advised Green of his *Miranda* rights and Green waived those rights. Docs. 173 at 2; 184 at 7; 225, Government Exhibit 3 at 36:29 to 37:08.

The interview lasted about five hours.  Doc. 225, Government Exhibit 3 (35:57-5:39).  Approximately 35 minutes into the interview, the following conversation took place:

> **Agent Hipkiss**: You just need to be straight out man.  It's the bottom line.
>
> **Green**: I don't know man.  Just got to get me a lawyer man, figure it out.  I don't know what's goin' on.
>
> (*Pause from 1:10:23 to 1:10:39*)
>
> **Green**: Mmm.
>
> (*Pause from 1:10:40 to 1:10:43*)
>
> **Green**: I know my name ain't come up in this.
>
> **Detective Poppe**: Your name is all over this …

*Id*. at 1:10:07 to 1:10:47.  Green then continued to participate in the interview without any further reference to a lawyer.  *Id*. at 1:10:48 to 5:39.

## B. Wiretap

On February 12, 2019, Judge Lisa Lott of the Superior Court of Athens-Clarke County, Georgia authorized the interception and recording of all types of electronic and oral communications occurring on cell phone number 573-208-6083 ("Target Telephone #5") and cell phone number 917-859-6468 ("Target Telephone #6").[2]  Doc. 216 at 3.  Both Target Telephone #5 and Target Telephone #6 were used by defendant Chambers.  *Id*.  The order authorizing the wiretap provides that the "Target Subjects," including Green and defendant Chambers, were suspected of committing various

---

[2] Green only challenges the intercepted communications occurring on devices associated with defendant Chambers.  Doc. 188 at 1.  Judge Lott issued two wiretap orders—one on February 7, 2019 and one on February 12, 2019.  Docs. 215; 216.  The February 7, 2019 order authorized the interception and recording of all types of electronic and oral communications occurring over, among others, Target Telephone #3 used by defendant Chambers.  Doc. 215 at 2-3.  The Government clarified that "communications were never intercepted between Chambers" and anyone over Target Telephone #3.  Doc. 183 at 4.  Thus, the February 7, 2019 wiretap order is not at issue.

criminal offenses: participation in criminal gang activity, conspiracy to commit participation in criminal gang activity, murder, and conspiracy to commit murder (the "Target Offenses"). *Id*. at 1. Judge Lott found that, based on the supporting affidavit of TFO Frost, there was probable cause to believe that the Target Subjects, including Green, were committing the Target Offenses, the Target Subjects were using the Target Telephones to communicate about the Target Offenses, the interception of these communications would "materially contribute to meeting the investigation goals," and the location information provided by the target telephones would be "relevant and material" to the investigation. *Id*. at 6-7.

The interception was authorized based on an application by Western Judicial Circuit District Attorney Kenneth Maudlin, supported by TFO Frost's affidavit. Doc. 216 at 35-104. TFO Frost's 50-page affidavit included, among other things:

- A four-page history of the Gangster Disciples, including information about the organization's alleged connection with violence;
- Evidence tending to establish that Green and defendant Chambers were members of the Gangster Disciples;
- The goals of the investigation, including to establish Green's and defendant Chambers' roles in the then-disappearances of Ruff and Jackson;
- TFO Frost's belief that Ruff's and Jackson's disappearances were due to their Gangster Disciple membership;
- A statement that the investigation suggested Green and defendant Chambers "conspired to kidnap and murder Ruff and/or Jackson";
- Information connecting Chambers to the murder of Rucker;
- Text messages intercepted over Ruff's cellphone that indicated Ruff was last in communication with Green prior to Ruff's disappearance; and
- Substantial detail establishing that the interception of Target Telephone #5 and Target Telephone #6 would advance the investigation into Ruff and Jackson's disappearances.

*Id*. at 47-91.

The communications occurring over the Target Telephones were monitored and heard by FBI agents in a wireroom located at the FBI's Athens, Georgia office. Docs.

183 at 4; 188 at 5 n.1.  Defendant Chambers was in Texas using Target Telephone #5 and Target Telephone #6 when communications occurring over these cell phones were intercepted pursuant to the wiretap.  Docs. 171 at 1-3; 183 at 4-5; *see* Doc. 216 at 86.

## C. Search of Green's Home

On March 18, 2019, Dekalb County, Georgia police officer A.E. Hardaway applied for a warrant to search Green's home.  Doc. 172-1.  The search warrant application stated there was probable cause to believe that a murder was committed. *Id*. at 5.  The stated purpose of the search was "to find evidence of murder as well as evidence of concealing the death of another."  *Id*. at 5.  This evidence was expected to include, among other things, firearms, gang-related paraphernalia, cell phones, tablets, DNA, and documentation regarding the storage unit where Ruff's and Jackson's bodies were found.  *Id*.

Officer Hardaway provided a three-page affidavit in support of the search warrant application.  *Id*. at 6-8.  This affidavit contained detailed information allegedly connecting Green to the murders of Ruff and Jackson.  *Id*.  The affidavit referenced communications between Green and others that were obtained through the authorized wiretap.  *Id*.  Also, Officer Hardaway stated: "On February 8, 2019, ACCPD interviewed Green while he was in custody in the Cobb County, Georgia jail on an outstanding warrant (unrelated to this investigation).  During a post-Miranda interview, Green was shown a picture of Jackson and Ruff and denied knowing them."  *Id*. at 8.

Based on Officer Hardaway's application, Dekalb County magistrate Judge J.L. Neal authorized the search of Green's home.  Doc. 172-1.  Law enforcement officers, including FBI agents and Dekalb and Gwinnett County officers, executed the search warrant that same day, March 18, 2019.  *Id*. at 11; Doc. 172.  The items obtained during

the search included a camera, cellphones, laptops, ammo, and thumb drives.  Doc. 172-1 at 11.

## II. STANDARD

Generally, the party moving to suppress bears the initial burden of production and persuasion.  *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977).[3] This burden may shift "in some well-defined situations."  *Id*.

When a defendant challenges the admissibility of custodial statements based on a failure to be advised of his *Miranda* rights, he "bears the burden of showing that he was in custody when he made the contested statements."  *United States v. Woodson*, 30 F.4th 1295, 1302 (11th Cir. 2022).  Only then does the government have "the burden of proving the defendant voluntarily waived his privilege against self-incrimination."  *de la Fuente*, 548 F.2d at 533.  And if a defendant was advised of his *Miranda* rights prior to a custodial interrogation, but he asserts that the suppression of custodial statements is warranted based upon a subsequent invocation of his right to counsel, he bears the initial burden of proving an unambiguous invocation of that right.  *See de la Fuente*, 548 F.2d at 533; *Davis v. United States*, 512 U.S. 452, 459 (1994); *United States v. Chan*, 2015 WL 13736217, at *8 (N.D. Ga. Nov. 17, 2015).  If he does so, the burden shifts to the Government to prove that, notwithstanding that invocation, he subsequently waived that right.[4]  *See de la Fuente*, 548 F.2d at 533.

---

[3] The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981.  *Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[4] The parties do not address the burdens of proof on this issue and the Court cannot find Eleventh Circuit or Supreme Court precedent on point.  However, based on *de la Fuente* and *Davis*, the Court can only reasonably conclude that the burden shifts as stated.  *See Chan*, 2015 WL 13736217, at *8.

Finally, "the burden is on a defendant who seeks to suppress evidence obtained under a regularly issued warrant to show the want of probable cause." *de la Fuente*, 548 F.2d at 534 (quoting *Batten v. United States*, 188 F.2d 75, 77 (5th Cir. 1951)). Regarding wiretaps, only when a defendant has proved that the wiretap was in fact unlawful does the burden shift to the government "to prove that the evidence in question was obtained from another source and is not tainted by the illegal surveillance." *Id*. No matter the situation, however, the movant "must first discharge his initial burden of producing some evidence on specific factual allegations sufficient to make a prima facie showing of illegality." *Id*. at 534. And, "[i]n passing on the validity of [a] warrant, consideration may be given only to information brought to the attention of the [issuing judge]." *United States v. Lockett*, 674 F.2d 843, 845 (11th Cir. 1982) (citations omitted). For the search warrant and the wiretap, "all of the evidence furnished to the [issuing-court] [was] included in the affidavit[s]." *Id*. Thus, the Court looks within the four corners of the affidavits attached to each to determine whether the requisite probable cause existed.

### III. DISCUSSION

**A. Motion to Suppress Custodial Statements**

Green moves to suppress statements occurring at two custodial interviews: (1) the February 8, 2019 interview at the Cobb County Jail, and (2) the March 18, 2019 interview at the Gwinnett County Detention Center. Docs. 170; 173.

*i. February 8, 2019 Interview at Cobb County Jail*

First, Green moves to suppress any statement from the February 8, 2019 interview at the Cobb County Jail. Doc. 170. He argues suppression is warranted

because he was not advised of his *Miranda* rights prior to Lieutenant Scott's and TFO Frost's questioning.  The Court agrees.

"[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning," he must be given specific warnings, i.e., advised of his *Miranda* rights, prior to questioning.  *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).  Only once a defendant is properly advised may he "knowingly and intelligently waive these rights and agree to answer questions or make a statement."  *Id*. at 479.  "[U]nless and until such warnings and waiver are demonstrated … no evidence obtained as a result of interrogation can be used against him."  *Id*.  The failure to be advised of these rights can result in a violation of the defendant's Fifth Amendment rights.  *Id*.

"A defendant is in custody for the purposes of *Miranda* when there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (internal quotation marks and citation omitted).  To determine whether a defendant was "in custody" during an interview, courts "look at the totality of the circumstances and ask whether a reasonable man in [the defendant's] position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave."  *United States v. Deason*, 965 F.3d 1252, 1259 (11th Cir. 2020) (internal quotation marks and citation omitted).  This "test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."  *Id*.  "And under the test, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person."  *Id*. (emphasis added).  The Eleventh Circuit has held that, even if a court "conclude[s] that a reasonable person would not have felt at liberty

to leave, [the court] still must consider whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *United States v. Woodson*, 30 F.4th 1295, 1303 (11th Cir. 2022).

Because the Cobb County Jail interview put a "restraint on" Green's "freedom of movement of the degree associated with a formal arrest," and because this restraint of freedom presented "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*," the Court finds that he was "in custody" for purposes of *Miranda*. *Brown*, 441 F.3d at 1347; *Woodson*, 30 F.4th at 1303. Green was in jail because of his arrest on an unrelated charge. Doc. 224. He was brought from general housing to a locked holding cell for the interview. *Id*. He was in that cell the entire interview surrounded by three law enforcement officers—one of whom was carrying a weapon. *Id*. At no point did any of the officers inform Green that he was free to leave. *Id*. And, based on the questions asked, a reasonable person would have understood that the officers believed Green had information about Ruff and Jackson. Under the totality of the circumstances, a reasonable innocent person in Green's position during this interview would have felt "a restraint on his freedom of movement to such extent that he would not feel free to leave." *Deason*, 965 F.3d at 1259.

The Government argues suppression is not warranted because Green was not "in custody" for purposes of *Miranda*, citing *Howes v. Fields* and *Maryland v. Shatzer*. Doc. 184 at 5-6; 565 U.S. 499 (2012); 559 U.S. 98 (2010). First, the authority cited by the Government stands only for the principle that an inmate is not "per se" in custody when questioned about matters unrelated to his conviction. *Howes*, 565 U.S. at 508-14; *Shatzer*, 559 U.S. at 112-14. Second, the interrogated defendants were inmates, not pretrial detainees. *Howes*, 565 U.S. at 502; *Shatzer*, 559 U.S. at 100-01. This was

significant to the Supreme Court in both cases.  In *Howes*, the Supreme Court repeatedly noted the difference between "a prisoner" and "a person who has not been convicted and sentenced."  565 U.S. at 511-512.  For example, in holding that "service of a term of imprisonment" is not per se "in custody" for purposes of *Miranda*, the court noted that "a prisoner, unlike a person who has not been sentenced to a term of incarceration, is unlikely to be lured into speaking by a longing for prompt release" and that "a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence."  *Id*.  And in *Shatzer*, the Supreme Court noted the difference between an individual in "pretrial custody" and someone who "has returned to his normal life" in prison.  559 U.S. at 107-08.

Here, Green was being held in Cobb County Jail after being arrested on an unrelated charge—he had not been convicted of that crime.  Thus, his "familiar surroundings" were still the "outside world," not a jail or prison.  *Howes*, 565 U.S. at 511. And, as discussed, the totality of the circumstances of the interview strongly support the Court's finding that a reasonable innocent person in Green's position would have felt "a restraint on his freedom of movement to such extent that he would not" have felt "free to leave."  *Deason*, 965 F.3d at 1259.

Because the record demonstrates that Green was "in custody" for purposes of *Miranda* at the time of the February 8, 2019 interview, his Fifth Amendment Rights were violated when he was questioned by Lieutenant Scott and TFO Frost without first being advised of his *Miranda* rights.  Consequently, any statement made by Green at the February 8, 2019 interview is suppressed.

*ii. March 18, 2019 Interview at Gwinnett County Detention Center*

Second, Green moves to suppress statements made by him at the March 18, 2019 interview at the Gwinnett County Detention Center.  Doc. 173 at 2-3.  He argues that he properly asserted his right to counsel during the interview and "the interview should have ended after his assertion."  *Id*. at 2.  Because the interview continued, he argues "any statement by him after [his assertion] must be suppressed based on him being in custody and initiating his *Miranda* and 6th Amendment rights to counsel."  *Id*. The Government argues that (1) Green "did not adequately invoke his right to counsel," and (2) even if he had, he "initiated further communication" with the officers."  Doc. 184 at 9-10.  The Government is correct.

Once a defendant receives his *Miranda* warnings and waives his right to counsel, "law enforcement officers are free to question him."  *Davis v. United States*, 512 U.S. 452, 458 (1994).  However, "if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available."  *Id*.  Courts make an objective inquiry into whether a defendant properly invoked his *Miranda* right to counsel—a defendant "must unambiguously request counsel."  *Id*. at 458-59.  A mere "reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel … [does] not require the cessation of questioning."  *Id*. at 459 (emphasis in original).  Thus, the defendant must make "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney."  *Id*.  Moreover, even where a defendant properly invokes his *Miranda* right to counsel, the questioning may begin again if he "himself reinitiates conversation."  *Id*. at 458; *see also Edwards v. Arizona*,

451 U.S. 477, 484-85 (1981) ("We further hold that an accused … having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police*.") (emphasis added).

Here, Green has not established that he unambiguously requested counsel. *Davis*, 512 U.S. at 458-59.  Rather, he merely stated, "just got to get me a lawyer man, figure it out."  Doc. 225, Government Exhibit 3 at 1:10:07 to 1:10:47.  At most, a reasonable officer under the circumstances could have understood Green's statement to mean that he *may* have been invoking or *might* at some point invoke his right to counsel, not that he unequivocally was.[5]  *Davis*, 512 U.S. at 459, 462.  In any event, after a twenty second pause, Green voluntarily resumed the conversation.  At no point did Green again mention a lawyer.  Thus, even assuming *arguendo* that his statement was an unambiguous invocation of his right to counsel, the Government has established that the officers were legally allowed to proceed with questioning after Green chose to continue with the interview.  *Edwards*, 451 U.S. at 484-85.

Accordingly, Green's *Miranda* rights were not violated at the March 18, 2019 interview.  Any statement made by Green during this interview is not suppressed.

For the foregoing reasons, Green's motion to suppress certain custodial statements (Docs. 170; 173) is **GRANTED in part and DENIED in part**.

---

[5] With no citation of relevant authority, Green broadly asserts that the Government has the burden of proof on all issues raised by his motions.  Docs. 170 at 1; 171 at 3; 172 at 7.  Even assuming the Government had the burden of proving that Green did not effectively invoke his right to counsel, it would, on these facts, have carried that burden.

**B. Motion to Suppress Wiretap Evidence**

Next, Green moves to suppress any evidence obtained from the interception of communications occurring over Target Telephone #5 and Target Telephone #6 because (1) the wiretap application failed to establish probable cause, and (2) the interceptions were beyond the issuing-court's jurisdiction.  Doc. 171.

"An application for a wiretap authorization must be supported by the same probable cause necessary for a search warrant."  *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990).  Thus, the reviewing court's task "is simply to ensure that the magistrate had a *substantial basis* for concluding that probable cause existed."  *Id*. (emphasis added) (cleaned up).  As with search warrants, the issuing magistrate judge's decision is afforded great deference, and he or she "is to make a 'practical, common-sense decision' about whether the 'totality of the circumstances' indicate that there is probable cause that the sought-for evidence will be obtained."  *Id*. (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Green argues, in conclusory fashion, that the wiretap application did not establish probable cause because it did "not sufficiently identify a factual basis that the targeted parties were involved in violent, gang-related activities."  Doc. 171 at 9-10.  According to Green, the application only contained "opinions" about the Gangster Disciples.  *Id*.  Not so.  TFO Frost's affidavit in support of the wiretap shows that he is part of the FBI Middle Georgia Gang Task Force, he has extensive experience investigating gang activity, and he is familiar with gang identifiers.  Doc. 216 at 35-38.  With this knowledge and access to already-intercepted communications, TFO Frost provided an extensive history of the organization and stated his finding, with supporting evidence, that defendant Chambers and Green were Gangster Disciple members.  *See id*. at 72

(paperwork linked defendant Chambers to the organization), 79 (Green posted Gangster Disciple identifiers on his Facebook page).  And, as TFO Frost provided in his affidavit, he believed Ruff's and Jackson's disappearances were "in some way due to their [Gangster Disciple] membership," and Green and defendant Chambers "conspired to kidnap and murder" Ruff and Jackson in furtherance of each of their roles within the organization.  *Id*. at 55-56.

In any event, TFO Frost's 50-page affidavit provided Judge Lott with "a substantial basis for concluding that" there was probable cause to believe Green and defendant Chambers were participating in the commission of the Target Offenses, that defendant Chambers was using Target Telephone #5 and Target Telephone #6 to communicate about the Target Offenses, and that the interception of communications occurring over Target Telephone #5 and Target Telephone #6 would further the investigations into defendant Chambers' and Green's participation in the Target Offenses.  *Id*. at 23-24.

Green's real argument is that the wiretap order did not authorize the interception of communications occurring over Target Telephone #5 and Target Telephone #6 because those phones were located in Texas at the time of interception.  Doc. 171 at 6-9.  His argument goes as follows: the Eleventh Circuit has held that district courts must defer to state law in determining the validity of state-issued wiretap orders, Georgia law defers to federal law to determine the legality of a wiretap order, and federal law only authorizes the interception of communications that occur on a device located within the issuing-court's jurisdiction.  *Id*.

In *United States v. Stowers*, the Eleventh Circuit expressly held that under Georgia law, Georgia state courts "have the authority to issue wiretap warrants for the

interceptions of calls if either the tapped phones or the listening post are located within their jurisdiction.  Put simply, as long as the listening post is within the state of Georgia, it does not matter where the call is made."  32 F.4th 1054, 1070 (11th Cir. 2022).  Here, although Target Telephone #5 and Target Telephone #6 were located in Texas at the time of interception, the listening post was in Athens, Georgia—well within Judge Lott's jurisdiction.  Docs. 183 at 4-5; 188 at 5 n.1.

Green asserts that the Court "is not bound by *Stowers*" because it "does not address the assertion that Georgia has deferred to Federal interpretation of where 'interception' occurs or what Federal authority on the matter is."  Doc. 171 at 7-9.   And according to Green, some unspecified federal law[6] requires the tapped device to be located within the issuing-court's jurisdiction.  *Id*.  However, the Eleventh Circuit in *Stowers* specifically noted that Georgia law was consistent with the federal wiretap statute regarding jurisdiction in state-issued wiretap orders.  32 F.4th at 1070; *see also United States v. Rodriguez*, 968 F.2d 130, 135-36 (2d Cir. 1992); *United States v. Jackson*, 849 F.3d 540, 551-53 (3d Cir. 2017); *United States v. Denman*, 100 F.3d 399, 403 (5th Cir. 1996); *United States v. Henley*, 766 F.3d 893, 911-12 (8th Cir. 2014).

Because the wiretap application established probable cause and because the Court is bound by *Stowers*, Green's motion to suppress the wiretap evidence (Doc. 171) is **DENIED**.  The wiretap evidence is not suppressed.

## C. Motion to Suppress Evidence Seized Pursuant to Search Warrant

Finally, Green moves to suppress any evidence obtained during the execution of the March 18, 2019 search warrant of his home. Doc. 172.

---

[6] Green cites only to the federal wiretap statute.  Docs. 171 at 7; 188 at 4.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons of things to be seized."  U.S. Const. amend. IV. "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location."  *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999).  "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Gates*, 462 U.S. at 238 (internal quotation marks and citation omitted).  "A magistrate's determination of probable cause should be paid great deference by reviewing courts."  *Id*. at 236.  "[T]he duty of a reviewing court is simply to ensure that the magistrate had a *substantial basis* for concluding that probable cause existed."  *Id*. at 238 (emphasis added).

Green argues any evidence obtained in the execution of the search warrant of his home must be suppressed because Officer Hardaway, the search warrant applicant and affiant, relied upon unlawfully obtained statements from the February 8, 2019 interview at the Cobb County Jail and the wiretap, and without those statements, the search warrant application failed to establish probable cause.  Doc. 172.  Only the statements from the February 8, 2019 interview are suppressed.  Therefore, the Court must excise these statements from Officer Hardaway's affidavit and determine whether the remaining portions of the search warrant application established probable cause.

Officer Hardaway's affidavit cited two statements obtained during the five to ten minute Cobb County Jail interview: (1) "On February 8, 2019, ACCPD interviewed Green while he was in custody in the Cobb County, Georgia jail on an outstanding warrant (unrelated to this investigation)"; and (2) "During a post-Miranda interview, Green was shown a picture of Jackson and Ruff and denied knowing them."[7]  Doc. 172-1 at 8.  Putting those statements aside, Officer Hardaway's affidavit provided extensive and detailed information, including, among other things:

- Text messages indicating that Green was the last person, other than Jackson, to communicate with Ruff prior to his murder;
- Evidence showing that Green discontinued use of his cell phone shortly after Ruff's and Jackson's murders;
- Evidence linking Green to a vehicle that was seen in a surveillance video meeting with Ruff and Jackson the night of their murders;
- Green's Facebook posts "confirming [his] membership in the Gangster Disciples";
- Cell phone records indicating that Green was in communications with defendants Chambers and Carlisle "before and during the time [Green] was finalizing the meeting with" Ruff and Jackson;
- Communications between Green and defendants Chambers and Carlisle "confirming" Green "had knowledge of the murder of Jackson and Ruff" and was "taking steps to conceal their death," including statements by Green regarding his encounters with police about his vehicle; and
- An explanation of the discovery of Ruff and Jackson's bodies.

Doc. 172-1.  After excising the suppressed statements, the Court easily finds that the extensive information plausibly linking Green to the murders provided a substantial basis for the Dekalb County magistrate judge to conclude that there was probable cause that evidence of Ruff's and Jackson's murders would be found in Green's home. Indeed, Green does not explain how his denial that he knew Ruff and Jackson adds

---

[7] Green does not challenge the truthfulness of the second statement and therefore did not request a *Franks* hearing.  *Franks v. Delaware*, 438 U.S. 154 (1978); *United States v. Valencia-Trujillo*, 573 F.3d 1171, 1182 (11th Cir. 2009).

anything of consequence to the probable cause determination and the Court can discern none.

Green further argues that "nothing about the crimes described as being under investigation in the search warrant application suggested [his] home was in any manner connected to the crimes alleged" and that Officer Hardaway "presented numerous opinions without factual support."  Doc. 172 at 3-4.  First, "[u]sing common sense in evaluating the facts," the Court easily concludes that the search warrant application established "a link between" Green's home and the murders of Ruff and Jackson. *United States v. Kapordelis*, 569 F.3d 1291, 1312 (11th Cir. 2009); *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002).  The affidavit reveals that Green's vehicle and electronic devices were used in the commission of the murders—items "normally expected to be hidden in" a home.  Doc. 172-1 at 6-8; *Kapordelis*, 569 F.3d at 1310. Second, the affidavit was not riddled with opinions.  Rather, the information was provided with detailed specificity and was based on facts learned by law enforcement during the investigation into Ruff's and Jackson's murders.  *See*, *e.g.*, Doc. 172-1 at 6 (text messages obtained pursuant to a records request showed that Green agreed to meet with Ruff prior to Ruff's disappearance), 7 (a traffic stop by Georgia State Patrol linked Green to the vehicle seen on relevant surveillance footage), 7 (Green's Facebook page contained Gangster Disciple references).

Even if the benign snippet of suppressed information in the search warrant application somehow was necessary to establish probable cause, *Leon*'s good faith exception applies.  *United States v. Leon*, 468 U.S. 897 (1984).

In *Leon*, the Supreme Court held that exclusion of evidence seized pursuant to a warrant based on a lack of probable cause is appropriate only "if the officers were

dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id*. at 936.  Thus, "courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause." *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002) (citing *Leon*, 468 U.S. at 922).

*Leon*'s good faith exception, however, does not apply in the following four sets of circumstances: "(1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id*. (internal quotation marks and citations omitted).

Here, Green has not provided any evidence, and the record does not suggest, that Officer Hardaway and/or the executing officers acted dishonestly, recklessly, or with objective unreasonableness.  Indeed, the record demonstrates that all the officers "engage[d] in 'objectively reasonable law enforcement activity.'" *Id*. (quoting *Leon*, 468 U.S. at 919-20).  And clearly none of the four described sets of circumstances apply here to render the exception inapplicable.

Thus, Green's motion to suppress evidence obtained during the execution of the search warrant (Doc. 172) is **DENIED**.  The evidence obtained during the search is not suppressed.[8]

## IV. CONCLUSION

Accordingly, Green's motion to suppress his custodial statements (Doc. 170; 173) is **GRANTED in part and DENIED in part**.  The statements made by Green during the February 8, 2019 interview at Cobb County Jail are suppressed.  Green's motion to suppress the evidence obtained in the execution of the search warrant (Doc. 172) and motion to suppress the wiretap evidence (Doc. 171) are **DENIED**.

**SO ORDERED**, this 6th day of June, 2023.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[8] Perhaps there is one unanswered question here—whether the independent source doctrine is of any relevance.  *See Murray v. United States*, 487 U.S. 533 (1988).  It appears it is not.  Neither the Government nor Green suggests that it is.  Even if it was, the Court is quite comfortable concluding as a matter of fact that Officer Hardaway still would have sought the search warrant absent the February 8, 2019 statements.  However, if the parties wish to discuss this issue, it can be addressed at the July 25, 2023 pretrial conference.